# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JEAN GERMAIN                                        *

Plaintiff                                           *

v                                                   *          Civil Action No. JFM-13-382

WEXFORD HEALTH SOURCES, INC., *et al.* *

Defendants                                          *
                                                  ***

## MEMORANDUM

Pending is defendants' motion to dismiss or for summary judgment. ECF No. 25. The motion is opposed by plaintiff. ECF No. 38. The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated herein, defendants' motion, construed as a motion for summary judgment, shall be granted in part and denied in part. Additionally, plaintiff's pending motions for preliminary injunctive relief shall be denied in part. ECF No. 17 and 30.

## Background

Plaintiff, an inmate confined in North Branch Correctional Institution (NBCI), alleges he sustained injuries during a cell extraction on January 17, 2013, which were not properly addressed by defendants. ECF No. 1. He claims that during the extraction from his cell, officers beat him about the head and face, "busted his lip", knocked his tooth almost completely out of his mouth, punched him on both sides of his body and twisted his left hand and right foot. *Id*. at p. 4. In addition, mace was deployed. *Id.*

Following the extraction, plaintiff claims he was taken to the medical unit where he was seen by a nurse, who down-played all of his injuries except for the injury to his mouth which was too great to ignore. Plaintiff asserts the nurse did not perform a physical examination and did not

wash the mace from his eyes. He states the nurse also refused to contact a doctor to get permission to give him "a shot of pain killer" and she refused to refer him to a "provider." *Id*. at p. 5.

Despite his exposure to mace, plaintiff alleges he was not given a shower; rather he was placed in isolation with no running water, sheets or blankets. *Id*. He claims the water in the cell was not turned on until approximately five hours later, when the shift changed. Corporal Gomer turned the water back on in plaintiff's cell and contacted defendant Autumn Durst, a nurse, regarding plaintiff's injuries. Plaintiff claims that Durst refused to see him, explaining that plaintiff was scheduled to see the dentist in the morning. *Id*. at p. 5. The following morning plaintiff claims he spoke with defendant Kristi Cortez, a nurse, who was making her rounds on the segregation tier. He states she refused to see plaintiff about his "other injuries" and told him he would be seen by the dentist later that morning. *Id*. at p. 6.

Plaintiff asserts that later that day he spoke with Lt. Pennington about his injuries and Pennington asked a nurse to check on plaintiff. The nurse did "a quick check on plaintiff" and told him he did not have a broken foot, but that his knee and ankle were sprained. Plaintiff claims the nurse did not address his other injuries and refused to provide plaintiff with any relief for his pain, instead advising him to keep his knee and ankle elevated. *Id*. at p. 6. She further advised plaintiff that due to the swelling in his knee and right foot, an x-ray would be scheduled for the following Monday, January 21, 2013. *Id*. at pp. 6 – 7.

Plaintiff saw the dentist and claims the dental assistant was so alarmed by the appearance of his foot and other injuries, she made a request for a doctor to examine plaintiff. She was advised, however, that plaintiff should submit a sick call slip to see the doctor. Plaintiff's tooth could not be saved and was extracted by the dentist. An x-ray of plaintiff's mouth caused the

dentist to become concerned that plaintiff may have a broken jaw, but plaintiff claims the dentist wanted someone with more experience to look at the x-ray. *Id*. at p. 7.

On January 19 and 20, 2013, plaintiff claims he saw Cortez on the housing unit making rounds. Despite his requests for medical attention, he claims Cortez simply told him to fill out a sick call slip. Plaintiff was in an isolation cell where he alleges he was without the ability to obtain and file a sick call slip. *Id*. at pp. 7 – 8. Plaintiff further states that he was provided three sick call slips to fill out "during the 3-11 shift" on January 20, 2013. He states he filled out all three slips and they were placed in the sick call box by the officer who provided them to plaintiff. *Id*. at p. 8. The following day plaintiff's knee and foot were x-rayed. Later the same day, plaintiff was moved back to his regular cell where he filled out two additional sick call slips. *Id.*

On January 22, 2013, plaintiff "complained to RN Jodi about his injuries and showed her his swollen right foot." *Id.* Plaintiff claims the nurse told him that "they might see him later that day, but in the meantime to not use hot water on the right foot and to keep his right leg elevated." *Id.* at pp. 8 – 9. Plaintiff claims he did not see Dr. Ottey that day. *Id*. at p. 9.

On January 23, 2013, plaintiff spoke to Cortez about his injuries and again showed her his swollen foot. Plaintiff claims she again declined to provide him with any pain relief and instead told him to fill out a sick call slip. When plaintiff told Cortez he had already done so, she explained that "it takes time." *Id*. at p. 9. Plaintiff alleges he again filled out a sick call slip, but as of the date of the filing of this complaint, February 4, 2013, he had not been seen, nor had he received any pain medication. *Id*. Plaintiff claims he suffers severe headache, body soreness, a swollen right knee and foot, and numbness in his pinky finger on his left hand. *Id*. at pp. 9 – 10. He asserts that he is unable to bear weight or lift his right leg. *Id*.

In an amended complaint, plaintiff alleges he was seen by a dentist, Dr. Graves, on February 8, 2013, who informed him that "tooth #31" needed to be extracted because it was very loose.[1] ECF No. 7 at p. 1. Plaintiff states he was reluctant to have the tooth removed because he was already missing three other teeth in that area; however, he claims Graves gave him "a lot of doomsday scenarios if he did not extract that tooth from [plaintiff's] mouth." *Id*. at p. 2. Plaintiff claims his reluctance was overcome when Graves promised him he would be provided dentures, but only if the tooth was removed. *Id*. Plaintiff permitted the removal of the tooth, but claims that impressions were not taken as a first step toward providing plaintiff with dentures which he states he has needed since 2009. Instead, plaintiff asserts the removal of the tooth was used as an excuse to change his diet from a high calorie diet to a mechanical soft diet. As a result of the change in his diet, plaintiff no longer receives an extra snack bag at night and he suffers from extreme hunger pains. *Id*.

Plaintiff additionally alleges that on February 16, 2013, he began seeing blood in his stool. Plaintiff suspects the ibuprofen he was prescribed for the pain in his ankle was causing him to bleed. He states he submitted a sick call request every day concerning this symptom, but finally felt compelled to return his medications to the nurse and told her it was making him sick and was inadequate to address his pain. ECF No. 7 at p. 3.

In a second amended complaint, plaintiff claims Case Manager Richard Roderick and Warden Bobby Shearin are responsible for denying him medical care because they denied an emergency administrative remedy request concerning his need for medical attention as frivolous. ECF No. 13. Additionally, he claims that from January 18, 2013, prison staff had an x-ray of plaintiff's mouth which showed he had a fractured jaw, but denied medical attention. He claims

_____
[1] Plaintiff attributes the loose tooth to being hit on his right cheek. ECF No. 7 at p. 1.

he did not receive pain medication until January 25, 2013, when he was taken to "Baltimore University" hospital. ECF No. 8 at pp. 1 – 2.

Defendants assert that following plaintiff's cell extraction on January 17, 2103, he was seen by Carla Buck, R.N., who noted plaintiff's complaints of an injury to his right ankle and shoulder, but observed no deformity, swelling, bruising or redness. Additionally, she noted that plaintiff was ambulatory without assistance. Buck observed that plaintiff had copious amounts of nasal drainage and watering eyes, but saw no evidence of respiratory distress. She noted he was suffering from a superficial laceration to the bottom right side of his lip as well as a loose upper front tooth. After consulting with Dr. Ottey, the medical director, Buck advised plaintiff he would be scheduled to see the dentist in the morning regarding his tooth. ECF No. 25 at Ex. 1, p. 8.[2]

On the morning of January 18, 2013, plaintiff was seen by Alan Graves, DDS, as planned. Panorex views were taken of plaintiff's jaw revealing an abscess at tooth #8 and evidence of a possible fractured jaw. Dr. Graves determined that plaintiff's tooth, which was loose, could not be saved and, with plaintiff's consent, pulled the tooth. Plaintiff was prescribed oral pain medication and antibiotics, and Dr. Graves submitted a request for an off-site evaluation of the panorex findings by an oral surgeon to rule out a fractured jaw. ECF No. 25 at Ex. 1, pp. 9, 72 – 76, and 78 – 88. Plaintiff was seen again later that day by Rebecca Leatherman, R.N. for a follow-up examination of plaintiff's right knee and ankle. Although there was no evidence of bruising, redness, swelling or deformity noted, an x-ray was ordered and plaintiff was instructed keep his leg elevated. *Id.* at p. 13.

On January 22, 2013, plaintiff was scheduled to be seen again in response to three sick call slips he submitted two days before complaining of severe headache as well as pain in his

---

[2] Page number references for ECF No. 25, Ex. 1 correspond to ECF pagination.

jaw, right knee and ankle. In addition, plaintiff complained he should have been seen and evaluated by a Physician's Assistant (PA) instead of a nurse for his injuries. Plaintiff was not, however, seen because he was off of the housing unit at the time of his appointment. He was rescheduled for the next available appointment. On January 23, 2013, an x-ray of plaintiff's ankle and right knee were completed and showed no evidence of fracture, dislocation or other abnormalities. ECF No. 25 at Ex. 1, pp. 14 – 17.

On January 25, 2013, plaintiff was sent to the University of Maryland Medical System (UMMS) for an evaluation by an oral surgeon and a CT scan of his brain and face. Plaintiff's CT scan showed evidence of an old fracture of the lamina papracea, a bone which forms part of the two bones (orbits) which contain the eyes. No surgical intervention was warranted based on the CT scan; however, plaintiff was provided with prescription recommendations for Tramadol and Tylenol and advised to complete taking prescribed antibiotics. *Id*. at pp. 57 – 76. Upon his return to the prison that day, plaintiff was seen by Elizabeth Blank, R.N., who noted that his only complaint concerned his foot. Dr. Ottey was advised of plaintiff's return and ordered ibuprofen to treat his foot pain. *Id*. at p. 20.

On January 26, 2013, plaintiff received a follow-up evaluation from Dr. Ottey for his injuries related to the cell extraction. At that time, plaintiff reported an old injury to his jaw from a car accident, consistent with the CT scan findings of an old fracture. During the examination of plaintiff's knee, Dr. Ottey noted plaintiff's complaints of pain on movement, but found no swelling in the knee. Additionally, plaintiff complained of pain in his left wrist when moving his hand and wrist. Dr. Ottey recommended plaintiff continue using ibuprofen and Baclofen, prescribed before the January 18th incident, for muscle spasms, and advised plaintiff to avoid lifting heavy weights. Plaintiff was instructed to return in 15 days if his condition did not

improve. Dr. Ottey did not prescribe Tramadol for plaintiff because he believed his pain could be managed with ibuprofen. ECF No. 25 at Ex. 2.

Plaintiff submitted three sick call slips between January 31, 2013 and February 1, 2013, complaining that the ibuprofen prescribed to him was not working, his right foot and knee were swollen, stiff, and painful, and denying he had refused to be seen by Dr. Ottey on January 30, 2013. ECF No. 25 at Ex. 1, pp. 28 – 30. On February 1, 2013, plaintiff was seen by Thomas Blaik, DDS for follow-up on his mouth injuries. Dr. Blaik noted that the extraction site for tooth #8 was healing and that tooth #31 required extraction. Plaintiff's consent was obtained and the tooth was extracted. *Id*. at pp. 79 – 80 and 85 – 86.

On February 5, 2013, plaintiff was again seen by Dr. Ottey for his pain and swelling in his right ankle and leg. During the examination, plaintiff denied stiffness, numbness, or tingling in his leg or ankle. Plaintiff also told Dr. Ottey that he was experiencing pain in his left jaw and explained the cell extraction injuries aggravated a prior injury to his face during a car accident. He claimed he was having difficulty chewing and reported tenderness at the tempromandibular joint. Based on the complaints concerning his jaw, plaintiff's diet was changed to a mechanical soft diet to promote healing to the jaw. No changes were made to plaintiff's medications. ECF No. 25 at Ex. 1, pp. 31 – 33.

The next day plaintiff submitted another sick call slip complaining that his pain had not resolved and asking about a pain medication shot he alleged Dr. Ottey had told him he would receive. Plaintiff was scheduled to be seen by Dr. Ottey in response to the sick call slip, but pending that evaluation plaintiff submitted another sick call slip on February 13, 2013, stating he was experiencing pain and swelling in his foot and leg. ECF No. 25 at Ex. 1, pp. 35 – 37. On February 14, 2013, plaintiff returned to the dentist for a follow-up assessment of his dental

injuries and it was noted that his mouth was healing with no swelling, tenderness, or lymphadenopathy. *Id*. at p. 87. On February 16, 2013, plaintiff was scheduled to be seen by Dr. Ottey, but defendants allege he refused to be seen in the clinic. *Id*. at p. 39. Plaintiff did not submit another sick call slip regarding his foot and ankle pain until April 9, 2013. *Id*. at pp. 40 – 41.

Plaintiff again complained that his foot was painful especially when he sits in prayer and requesting that his mechanical soft diet be discontinued. Plaintiff was seen in response to his sick call slip on April 12, 2013, by Kimberly Hinebaugh, R.N., who noted plaintiff had a normal gait and range of motion with no swelling or tenderness to his right ankle. Despite the lack of evidence that plaintiff's ankle was seriously injured, he was referred to a higher level provider for further evaluation. ECF No. 25 at Ex. 1, pp. 41 – 46.

On April 17, 2013, plaintiff submitted a sick call slip asking about the status of his evaluation by Dr. Ottey, repeating his complaints of pain, and requesting pain medication. *Id*. at p. 48. Defendants allege that plaintiff refused to be seen for sick call on April 25, 2013. *Id*. at p. 49. On April 28, 2013, plaintiff was evaluated by Dr. Ottey for his reports of continued pain and swelling in his ankle which increased when pressure was placed on his foot. Plaintiff denied any numbness or tingling; however, his ankle was swollen, tender, and moderately painful with motion. Further x-rays were requested. In addition to addressing plaintiff's foot and ankle pain, Dr. Ottey provided plaintiff with stool cards for use in obtaining stool samples to evaluate his complaints of blood in his stool. Plaintiff attributed the blood in his stool to the ibuprofen he had been prescribed. Plaintiff's mechanical soft diet was discontinued and he was placed on a regular diet. He was advised that he would be scheduled for a follow-up evaluation in approximately two weeks and was instructed to keep his foot elevated. *Id*. at pp. 50 – 52.

On May 1, 2013, the results of plaintiff's stool samples were positive for occult blood. *Id*. at p. 55. As of the date defendants filed their dispositive motion, plaintiff was being scheduled for re-evaluation for the positive test results and further blood work has been ordered. Plaintiff's prescription for ibuprofen was discontinued and replaced with acetaminophen. Defendants allege that plaintiff refused to sit for the x-ray studies of his right ankle and foot. *Id*. at Ex. 2. With respect to plaintiff's ankle and foot, Dr. Ottey asserts that, based on the radiology studies completed immediately following the incident, neither physical therapy nor evaluation by an orthopedic specialist is warranted. *Id*.

**Standard of Review**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff members were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires

knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virgiinia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

In his opposition response plaintiff asserts there are genuine disputes of material fact in this case making disposition on summary judgment inappropriate. ECF No. 38. He further alleges that there exists video evidence of his appearance following the cell extraction which should be viewed in order to determine whether his condition was one so obviously requiring medical attention that denial of immediate medical care was unconstitutional. Specifically, he alleges it was deliberate indifference to require him to wait until the next day to see a dentist for his injury and provide no treatment for pain in the interim. *Id*. at p. 3. He further asserts that defendant Buck was deliberately indifferent when she did not provide plaintiff with water to wash his face when it was clear he was suffering effects from the pepper spray. Plaintiff maintains that Buck does not escape liability simply because Dr. Ottey did not tell her to provide him with pain medication because his condition was such that a lay person would know he needed immediate medical care. With respect to plaintiff's mouth injury, it is undisputed that he

suffered a "superficial laceration" to his lip and damage to his tooth. The bleeding from plaintiff's lacerated lip was controlled by the treatment provided by Buck. The failure to provide plaintiff with pain relief for a superficial wound is not deliberate indifference to a serious medical need.

More troubling to the court was the apparent failure to treat plaintiff for exposure to pepper spray. Defendants have not addressed plaintiff's assertion regarding removal of the chemical agent from his face and appear to suggest that, short of respiratory distress, there is no need for any treatment for pepper spray exposure. That assertion discounts the pain and discomfort caused by the chemical agent long after the need for its application has dissipated. Plaintiff alleges he was placed in a cell without running water for five hours and was thus deprived of the ability to remove the pepper spray from his face, causing him to suffer the effects longer than necessary. Defendants have not explained why medical staff did not treat plaintiff for the effects of chemical agent exposure, nor have they provided the court with information concerning the procedures in place for that treatment. Accordingly, defendants will be required to address the allegation.[3]

Plaintiff's ankle and knee were x-rayed one day following the cell extraction. ECF No. 25 at Ex. 1, pp. 11 – 13. No injury was revealed by the x-rays. *Id*. at p. 13. The swelling and pain to plaintiff's ankle and knee were attributed to a sprain for which plaintiff was provided ibuprofen and ice packs to reduce the swelling. ECF No. 38 at Ex. A, p. 4. The treatment provided for this injury sustained was constitutionally sufficient.

Plaintiff asserts defendants were deliberately indifferent to his serious medical need when no follow-up appointment was scheduled following his appointment with Dr. Blaik. ECF No.

---

[3] Service of the complaint as to Shearin and Roderick was never accepted. ECF No. 9 and 11. By separate order, service will again be attempted and defendants Shearin and Roderick will be directed to respond to the allegations regarding policies governing removal of chemical agents following a use of force incident.

38.  Plaintiff states Dr. Blaik discovered that he had a possible fractured jaw which should have been addressed by defendants.  *Id*.  Plaintiff does not address the evidence in the record indicating that the suspected fracture to his jaw proved to be an old injury consistent with his report of involvement in a motor vehicle accident years prior to the cell extraction.  Additionally, there was no medical determination that the old injury should be addressed surgically.  When plaintiff complained of jaw pain while eating, he was prescribed a soft diet which he chose to discontinue.  To the extent plaintiff asserts he should have been given pain medication other than that which was provided, his claim represents a disagreement with treatment that cannot form the basis of a constitutional claim.

Defendants allege plaintiff refused pain medication on January 29, 2013, and refused to be seen by Dr. Ottey on January 30, 2013.  ECF No. 25 at Ex. 1, pp. 25 – 27.  Plaintiff disputes the assertions he ever refused treatment.  ECF No. 38.  Defendants filed a reply to plaintiff's response and submitted a Release of Responsibility (ROR) form purporting to establish that plaintiff refused to be seen by Dr. Ottey on June 20 and 22, 2013.  ECF No. 39 at Ex. 1, pp. 1 - 2.  They allege plaintiff refused treatment because he declined to be handcuffed behind his back for transport to the medical department.  *Id*.  The ROR submitted by defendants is not signed by plaintiff or by a medical care provider.  *Id*.  Other ROR forms submitted are signed by staff, but not by plaintiff.  ECF No. 15 at Ex. 1, pp. 7, 25, 27, and 40.  The only ROR signed by plaintiff indicates his refusal to accept a medical diet.  *Id*. at p. 47.  Assuming plaintiff never refused treatment offered, the negligible delays involved regarding treatment for the injuries to mouth, ankle, and foot are not sufficient basis for a constitutional claim.

Plaintiff claims he has been denied adequate diagnostic treatment for blood in his stool and an 18 pound weight loss over a short period of time.  ECF No. 38.  Defendants claim there

are blood tests pending; however, there is no evidence that further diagnostic tests are planned to rule out serious illness. ECF No. 39. Plaintiff's assertion that the refusal to take steps to determine if he has a serious illness is evidence of deliberate indifference is compelling. Thus, defendants will also be required to supplement their response regarding the treatment plan to address plaintiff's symptoms and provide an explanation regarding the delay in implementing that plan.

In accordance with this opinion, a separate order granting in part and denying without prejudice in part defendants' motion for summary judgment follows. Plaintiff's pending motions for injunctive relief seek an order from this court requiring further treatment for his ankle and knee injury (ECF No. 17) and for treatment of his gastrointestinal symptoms (ECF No. 30). In light of the above-stated analysis, plaintiff's motion for injunctive relief regarding treatment of his ankle and knee injury shall be denied and the motion for injunctive relief regarding the gastrointestinal symptoms shall be held in abeyance pending defendants' supplemental response.


__August 2, 2013__                           _____/s/_____
Date                                                J. Frederick Motz
                                                   United States District Judge